## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**JACK LEE,**

      **Plaintiff,**

**v.**                            **Case No.  8:13-cv-2239-T-30EAJ**

**EQUITY PROPERTIES ASSET**
**MANAGEMENT, INC., et al.,**

      **Defendants.**

_____/

## <u>ORDER</u>

In this ERISA action, Jack Lee sues his former employer, Equity Properties Asset Management, Inc. ("EPAM"), EPAM's Defined Benefit Pension Plan, and EPAM's sole owner, Jacqueline S. Chang.  Currently pending are the parties' cross-motions for summary judgment (Dkts. 126, 127) and related motions to strike (Dkts. 137, 138, 146, 153).

The parties' dispute centers on whether Lee qualifies as a "Male direct owner," entitling him to EPAM's highest  pension benefit.  Defendants argue that Lee is not a direct owner because he owns no EPAM stock and, in fact, has previously disclaimed any ownership interest in EPAM.  Defendants suggest that Lee had two reasons for avoiding ownership.  First, Lee did not want EPAM profits contributed toward the $1.5 million that Lee owes in restitution for prior federal felony convictions.  Second, Lee's convictions would have disqualified EPAM from obtaining a lucrative federal contract.

Lee maintains that he qualifies as a "Male direct owner" because he had a stock option for EPAM, and he exercised that option on the day he was fired.  Lee also argues that he and Chang always operated as equal partners and intended that Lee receive pension benefits commensurate with his significant role in EPAM.

A close review of the record suggests that Lee and Chang were, at the very least, partners in a scheme to obscure Lee's control over EPAM, to their mutual advantage.  Nonetheless, in this ERISA action, the dispositive question is whether Defendants' decision to deny Lee the advantageous "Male direct owner" classification was arbitrary and capricious in violation of 29 U.S.C. § 1132(a)(1).  For the reasons that follow, the Court finds that the decision was arbitrary and capricious.

## Background

### Establishment of EPAM

Chang met Lee at a real estate investment seminar.  (Dkt. 128-10, "Chang Dep." at 47).  Lee later hired Chang to work with him at Home Buying Investors, Inc. ("HBI"), a company owned by Tom Camden, who is not a party to this action.  (*Id*. at 51).  While Chang and Lee were working at HBI, one of Camden's other business ventures, Equity Property Management ("EPM"), negotiated a contract with the National Credit Union Administration ("NCUA") to manage foreclosed houses.  (*Id*. at 73-77).  Lee made the initial contact with the NCUA.  (Dkt. 142-10, "Lee Dep." at 59).

In August 2007, Chang formed EPAM in order to take over the NCUA contract from EPM.  (Chang Dep. at 73-74, 77).  The NCUA contract resulted in EPAM making substantial

profits.  (*Id*. at 85, 93).  By December 2008, EPAM was worth several million dollars.  (*Id*. at 126).

The NCUA contract specifically prohibited the government from contracting with a business owned by a convicted felon or that employed a convicted felon.  (*Id*. at 86).  Lee had federal convictions for bank fraud, money laundering, wire fraud, and perjury.  (Lee Dep. at 26-31).  Lee was also subject to a $1.5 million restitution order.  (*Id*. at 31).  Chang knew of Lee's felony convictions.  (Chang Dep. at 53).

Lee and Chang jointly decided to incorporate EPAM, they both participated in the initial hiring of employees and vendors, and EPAM was initially funded from Lee's credit card.  (Dkt. 142-1 at ¶¶ 5-8).  Chang was listed as the sole owner of EPAM, while Lee ran the accounting department.  (Chang Dep. at 80-81).  According to Lee, he was always considered a fifty-fifty partner, and he and Chang routinely held themselves out as joint owners and partners.  (Dkt. 142-1 at ¶¶ 21-23; Lee Dep. at 70).  However, Lee had no stock ownership interest in EPAM because, had he held stock, EPAM could not have obtained the NCUA contract.  (Lee Dep. at 106-111, 134-35).

Although Lee had a significant role in EPAM, he was paid through Camden's company, HBI, which was not related to EPAM.  (Chang Dep. at 198-99).  HBI and EPAM had a verbal agreement for EPAM to send a check to HBI for the work Lee did for EPAM.  (*Id*. at 87-88).

While Lee was working for EPAM and being paid by HBI, a portion of Lee's earnings were garnished for restitution payments.  (Dkt. 141-2 at 1-2).  In a letter to the U.S.

Attorney's Office dated June 29, 2009, Lee's attorney, L. Lee Smith, acknowledged that "[s]ome confusion may exist because restitution payments continued on behalf of the garnishee (HBI) after Mr. Lee's work was transferred to EPAM." (*Id*. at 2).  Although Smith admitted that Lee worked for EPAM, he also stated that Lee "has never had an ownership interest in HBI, EPM, or EPAM."  (*Id*.).

Smith's letter did not mention the fact that Lee and Chang had previously entered into a written agreement providing Lee with an option to purchase 50% of EPAM's stock.  Lee also failed to disclose the option in subsequent financial disclosures to the government.  (Lee Dep. at 102-06).

The stock option was memorialized in a Stock Purchase Agreement ("the Option Agreement") between Lee and The Chang Group, Inc.  (Chang Dep. at 123; Dkt. 128-14).  The Option Agreement defined The Chang Group, Inc. to include EPAM and four other companies.  (Dkt. 128-14 at 3).   Lee had the option to purchase 50% of the common stock of The Chang Group, Inc. for $100.00.  The option could be exercised at any time during Lee's employment by The Chang Group, Inc. or an affiliated company, prior to 2020.  If The Chang Group, Inc. terminated Lee, he maintained the right to exercise the option within one year of termination.  To exercise the option, Lee was required to "provide Chang with 5 days notice and a certified check for $100.  On tender of the check, Lee shall be considered a 50% shareholder."  Chang and Lee signed the Option Agreement on March 17, 2009, but the Agreement specified that it was executed as of December 1, 2008.  (*Id*. at 3-4).

***Establishment of the Pension Plan***

In 2008, EPAM decided to investigate the creation of a defined benefit plan.  (Chang

Dep. at 94-95).  One of Lee's goals in establishing a pension plan was to avoid the imposition

and enforcement of restitution orders.  (Lee Dep. at 82-83).

EPAM selected BSP Consulting, Inc. ("BSP") to prepare the plan and to act as third-

party administrator for the plan.  (Chang Dep. at 100-01; Dkt. 142-1 at ¶ 17).  BSP is not a

party to this action, although both sides present substantial evidence concerning their

communications with BSP.  The majority of those communications were with Janet

Panebianco, a partner at BSP and a certified public accountant.  (Dkt. 128-1, "Panebianco

Dep." at 17-19).

Lee informed Panebianco that the purpose of the plan was to maximize benefits for

himself and Chang and to minimize the contribution requirements for other rank-and-file

employees.  (*Id*. at 20).  BSP prepared illustrations with the names of participants, estimated

contribution amounts, and the estimated tax benefit created by the plan.  (*Id.* at 22).  The

illustrations were based on information provided by Lee and assumed that both Lee and

Chang were owners of EPAM.  (*Id.* at 23-25).  According to Panebianco, Lee provided a

spreadsheet identifying himself as 50% owner and Chang as 50% owner. (*Id.* at 33, 109-11).

BSP hired Haness & Associates ("Haness"), an actuarial firm, to prepare the plan

documents.  (*Id.* at 26, 29).  Haness drafted the plan so that it closely approximated the

estimated benefits on the illustrations.  (*Id.* at 29).  In particular, the plan provided that a

participant's normal retirement benefit would be determined by applying the appropriate

benefit percentage to the participant's average monthly compensation multiplied by years of service.  (Dkt. 127-3 at 27).  With respect to the benefit percentage, Section 2.3.2 provided three employee classifications, each with a corresponding benefit percentage:

| Employee Classification | Benefit Percentage |
| --- | --- |
| A | 6.25% |
| B | 10.5% |
| C | 0.5% |

(*Id.*).  The plan described the employee classifications as follows:

| Employee Classification | Description |
| --- | --- |
| A | Female direct owners |
| B | Male direct owners |
| C | All others not listed in class A or B |

(*Id.*).  The central issue in this case is whether Lee fits the description of "Male direct owners" and is therefore entitled to the highest benefit percentage of 10.5%.

Haness created the descriptions based on the census information and illustrations produced by BSP, which listed Chang and Lee as owners.  (Panebianco Dep. at 33).  According to Panebianco, the term "Female direct owners" was intended to apply to Chang and the term "Male direct owners" was intended to apply to Lee.  (*Id.* at 135-36).  Class B had a higher benefit percentage than Class A because Lee is older than Chang.  (*Id.* at 31).

On July 3, 2008, Chang signed the Equity Properties Asset Management, Inc. Defined Benefit Pension Plan ("the Pension Plan") as owner and trustee.  (Chang Dep. at 108; Panebianco Dep. at 36; Dkt. 127-4 at 45).  EPAM was the plan administrator, and Chang controlled EPAM as the plan administrator.  (Chang Dep. at 165).

*Lee's termination*

Chang terminated Lee on April 10, 2012.[1]  (Chang Dep. at 134-35).   According to

Chang, she terminated Lee because he was writing company checks to himself and his family

members.  (*Id*. at 131).   Chang also terminated Lee because "[b]usiness ventures that the

company was about to embark on would have had no chance, given he's a convicted felon."

(*Id*.).

On the day he was terminated, Lee exercised his stock option.  (Chang Dep. at 143-44;

Dkt. 142-1 at ¶ 26).   By letter dated April 13, 2012, The Chang Group, Inc.'s attorney,

Joshua Dorcey, stated that the option had been "properly exercise[d]" as to EPAM and three

other companies, but disputed the validity of the exercise as to other companies owned by

The Chang Group, Inc.  (Chang Dep. at 144-45; Dkt. 142-1 at ¶ 27; Dkt. 128-14 at 7-8).   By

letter dated April 30, 2012, a different attorney, Theodore Tripp, stated that Chang did not

dispute the tender of the $100.00 check, dated April 10, 2012, but declined to accept it.  (Dkt.

128-14 at 10).   Tripp further stated that he was returning the check, with the understanding

that "to the extent that your client has a right to exercise any stock option, the check was, in

fact, received by my client."  (*Id*.; Chang Dep. at 145; Lee Dep. at 69-70).   Immediately after

Lee's termination, Lee and Chang became involved in state-court litigation over the stock

option and Lee's alleged defalcation.  (Chang Dep. at 185; Dkt. 126-1; Dkt. 141-1 at ¶ 8).

---

[1] In his motion for summary judgment, Lee maintains that he was terminated on April 12, 2012, because a pay stub reflects that he was paid through April 12, 2012.  (Dkt. 127 at 7).  The disparity in dates is not material.

*The Pension Plan dispute*

One day after Lee's termination, BSP informed Chang that Lee was requesting distribution forms.  (Chang Dep. at 148; Dkt. 127-7 at 1).  Chang responded, "He is terminated.  Please do not prepare any forms[.]"  (Dkt. 127-7 at 1).  Panebianco replied:

> I understand that he is terminated but keep in mind that the plan documents allow him to receive a distribution of his vested account balance.  Now the plan does allow for an administratively reasonable time after termination in order to prepare and furnish the necessary distribution paperwork.  So we could possibly stall for a short time, but it sounds like he is going to force the issue.

(Dkt. 127-7 at 2-3).  Nine days later, on April 20, 2012, Panebianco reported to Chang that Lee's attorney had requested that BSP process Lee's distribution forms.  (Dkt. 127-8).

On May 17, 2012, Chang asked Panebianco whether Lee had the ability to move funds from the Pension Plan.  (Dkt. 127-11 at 1).  In response to that inquiry, Panebianco again stated:

> Because Jack is terminated, he is eligible to receive a distribution of his vested account balance within the plan.  He has been calling our office regularly and gets very upset when we inform him that we are not allowed to give him information[.] . . . Since he does, by law, have the right to a distribution of his vested account balance, he may at this point file a complaint with the Department of Labor. . . . If the DOL does open an inquiry, they will require you to distribution [*sic*] the funds to Jack.  There is no provision in the plan that will allow you to postpone the distribution.

(*Id.*).  In response, Chang asked for the vested amount.  (*Id.* at 2).  Panebianco stated that Lee's balance in the Pension Plan was approximately $360,000.  (*Id.*).

On May 21, 2012, Chang asked Panebianco if she could apply debt to any distribution to Lee. (Dkt. 127-11 at 4).  Panebianco responded that Chang must follow the plan

documents, which required distribution as soon as practicable following termination, and that Chang could not make deductions.  Panebianco further stated: "In order to even get the process going however, Jack will need to be provided with distribution forms for both plans. We will prepare the necessary forms once we receive your authorization." (*Id*. at 4-5).

On June 13, 2012, Panebianco again asked Chang if she would like BSP to prepare the distribution forms.  (Dkt. 127-12).  Chang did not authorize BSP to prepare distribution forms until July 2, 2012.  (Panebianco Dep. at 72).  By email on July 20, 2012, before BSP issued the forms, Lee's attorney informed Panebianco that nearly 90 days had elapsed since Lee formally requested monthly pension distributions and stated:

> This is Mr. Lee's final demand for you to begin paying to him his monthly distributions.  To clarify: Mr. Lee is NOT requesting a lump sum payout, nor is he requesting that pension be rolled into a separate account.  He simply wants to immediately start receiving his monthly pension disbursements.

(Dkt. 127-15 at 1).

On July 25, 2012, Panebianco provided Lee's attorney with forms titled "Notice to Participant of Distribution Election" ("the Election Forms").  Panebianco requested that the Election Forms be signed and returned to her office.  (Panebianco Dep. at 73-74; Dkt. 127-15 at 2).  In relevant part, the Election Forms stated: "You are entitled to a distribution under the [Pension Plan]," and notified Lee of the amount of his benefits, the date the payments were to begin, and the method for calculating the benefits.  (Dkt. 127-16 at 1, 4-5).  The Election Forms allowed Lee to choose between a level monthly benefit, a direct rollover, a lump sum payment, or installment payments.  (*Id*. at 1).

The Election Forms calculated Lee's benefits using the Class B rate of 10.5%, applicable to "Male direct owners." (Panebianco Dep. at 82; Dkt. 127-16 at 4).  However, the Election Forms contained an inaccurate termination date of August 11, 2011, which provided Lee with only four years of service for purposes of calculating his vested benefit. (Panebianco Dep. at 77-79; Dkt. 127-16 at 4).  Chang notified BSP that Lee had been terminated on April 10, 2012 and that there may be an error in the distribution package. (Panebianco Dep. at 80; Dkt. 127-15 at 3).  BSP corrected the error in its system, but no corrected Election Forms were provided to Lee.  (Panebianco Dep. at 80-81).

On July 27, 2012, Chang signed a "Letter of Authorization to Transfer Funds or Securities" to Lee in a one-time amount of $40,608.26.  (Dkt. 127-17 at 3).  Pursuant to a garnishment order, Chang authorized $13,536.09 to be paid to the U.S. District Court in Peoria, Illinois.  (Dkt. 127-17 at 1).  The amounts represented Lee's required minimum distribution ("RMD") under the Pension Plan, calculated at the Class B rate.  (Chang Dep. at 183-84; Dkt. 40 at ¶ 50; Dkt. 43 at ¶ 50).

Although Lee received his RMD, he did not begin receiving monthly pension benefits. (Panebianco Dep. at 88).  Panebianco testified that Lee did not receive benefits because he never returned the Election Forms selecting a chosen method of payment.  (*Id.*).

 Approximately six months later, on January 14, 2013, Chang and Lee entered into a Mediated Settlement Agreement in the state-court litigation ("the Settlement Agreement"). (Dkt. 127-18).  As part of the Settlement Agreement, Lee and his wife agreed to "fully relinquish or otherwise waive any right, title or interest they may have or otherwise assert in

any and all of the CHANG entities stocks or assets." (Dkt. 127-18 at 4). With respect to the Pension Plan, the Settlement Agreement provided: "Chang will perform any and all lawful acts necessary to begin and continue payments as per the Equity Properties Asset Management, Inc. 401(K) Plan & Defined Benefit Pension Plan as it existed on January 1, 2012, administered by BSP Consulting for the benefit of Jack M. Lee." (Dkt. 127-18 at 3). The only outstanding issue at that point was whether Lee would receive four years or five years of credit for vesting purposes. (Dkt. 128-15 at ¶ 13; Dkt. 141-1 at ¶ 9).

While EPAM and BSP were investigating the vesting issue through Lee's payroll records, Chang informed BSP that Lee had been paid as an employee of HBI from 2005 to May 2009. (Dkt. 127-20 at 1). At some point, Chang also informed Panebianco that Lee had never been an owner of EPAM. (Panebianco Dep. at 103). Panebianco then raised the issue that the Pension Plan had been designed around the fact that both Lee and Chang were owners. (*Id.*).

By letter dated February 13, 2013, Darol Carr, who was Chang's attorney in the state-court litigation as well as Chang's attorney in the instant action, informed Lee's attorney, Jeffrey Rice, that BSP had raised "significant questions . . . associated with the funding of the [Pension Plan]," and Chang "has absolutely no other option but to seek independent legal counsel for the [Pension Plan]." (Dkt. 127-23 at 1-2). On April 24, 2013, Chang retained attorney Carol Myers. (Dkt. 127-24). Notwithstanding Carr's earlier statement to Rice, Chang retained Myers on behalf of The Chang Group, Inc. and related companies, not the Pension Plan. (*Id.*; Chang Dep. at 216; Dkt. 128-7, "Myers Dep." at 17-19).

By email dated June 6, 2013, Carr informed Rice: "Once the retirement plan [attorney] Ms. Meyers [*sic*] and the Administrator started looking into these plans there are a plethora of issues regarding the initial set up and funding of these plans." (Dkt. 127-33 at 3).   Lee asked Rice to obtain clarification as to "the plethora of issues" being investigated.  (*Id*. at 2). In response, Carr stated that he had a call scheduled that same day with Myers and Chang to review the issues.  He further stated: "There is nothing in the thought process or evaluation to hide and you are welcome to anything in the analysis."  (*Id*.).

The following day, Carr emailed Rice that they were examining the amount of Lee's compensation for each year, and whether the compensation was from EPAM or from unrelated companies, such as HBI.  (*Id*. at 1).  Carr then forwarded the email to Chang and Myers, stating: "I did not include other issues about 'direct owner' which would reduce him to .5% as opposed to 10%.  We will address that later."  (*Id*.).

On the day she was retained, Myers was told that Lee was not a direct owner.  (Myers Dep. at 28).  A note from Myers' file, dated July 12, 2013, indicates that Carr asked Myers to prepare a research memorandum supporting the interpretation that Lee's stock option did not cause him to be a "direct owner."  (Dkt. 127-25 at 4; Myers Dep. at 32-33).  Myers understood that the memorandum was prepared from the standpoint of representing The Chang Group, Inc. and that one of the purposes of preparing the memorandum was "with an eye to it being used to defend our position in litigation." (Dkt. 127-27; Myers Dep. at 34-38).

After Carr reviewed the memorandum that Myers prepared, he requested that Myers turn it into an opinion of counsel letter.  (Dkt. 127-28).  Carr stated:

> I think best to be as transparent as possible as to what the Trustee is relying upon. Therefore [Chang] has all indicia of acting in good faith AND I don't think [Chang] would be held liable as a trustee for relying on opinion of competent counsel.

(*Id*.).   After Myers prepared the opinion letter, she sent it to Chang and Carr for review. (Myers Dep. at 44-45).

The final opinion letter from Myers was dated August 5, 2013.  (Dkt. 127-34).  The letter was based on factual information provided by Chang and others, which Myers did not independently verify.  (*Id*. at 1; Myers Dep. at 43-46).  Among other points, the letter stated that Lee was terminated on April 9, 2012, rather than April 10, 2012.  (Dkt. 127-34 at 1). The letter also stated that Lee never exercised the option during his employment.  (*Id*. at 1, 10).  Myers' legal analysis acknowledged that there was conflicting authority on the question of whether an option holder is an "owner" of the underlying stock.  Myers ultimately determined that the holder of an option is not an equitable, legal, direct, or beneficial owner of the underlying stock.   As a result, Myers concluded that Lee was never a "direct owner" under the Pension Plan, and that his benefits should therefore be recalculated under the lower Class C rate of 0.5%, rather than the Class B rate of 10.5%.  (*Id*. at 1, 10-11).

*The Pension Plan determination*

By letter dated that same day, Carr informed Lee's attorney that Myers had determined that Lee was not a "direct owner," and that Lee could only be classified as a Class C employee.  (Dkt. 127-30 at 3).  Carr further explained that any benefit under the Pension Plan would be offset by the benefit provided under EPAM's separate 401(k) plan

("the 401(k) Plan").  Because Lee had an accrued benefit in the 401(k) Plan that exceeded

the amounts due under the Pension Plan—when recalculated under the lower Class C

rate—Lee "never had a lawful entitlement to any benefit under the [Pension Plan]."  (*Id.*).

Carr concluded the letter as follows:

> In summary, Ms. Chang, as trustee, commissioned at significant personal cost and expense, a comprehensive compliance and legal analysis of the subject Plans to determine any and all "lawful acts" necessary to begin and continue payments under the subject plans.  After full and complete analysis, it is the determination of Attorney Myers, ERISA legal counsel; Janet Panebianco, Third-Party Plan Administrator; and Robert Haness, Plan Actuary; that Mr. Lee was never entitled to any benefit under the [Pension Plan] as employee Classification C or B.
>
> Therefore, Mr. Lee erroneously received $54,144.35 from the [Pension Plan] in 2012.  This letter serves as a demand that money be immediately repaid.
>
> Ms. Chang's conclusions of "lawful" obligations were reached in concert with independent ERISA legal counsel, Carol Myers; the Third-Party Administrator for the Plan, Janet Panebianco; and the Actuary for the [Pension Plan], Robert Haness.  To the extent that you have any alternate analysis information, data, documentation or information that you believe alters or modifies this conclusion you should provide it to us for review.

(*Id.* at 3-4).

That same day, Carr informed Assistant United States Attorney Gail Noll of Myers'

conclusion, again referring to Myers as "independent ERISA counsel."  (Dkt. 128-14 at 84).

Carr stated that, because Lee had been reclassified as a Class C employee, he was not entitled

to any benefits under the Pension Plan.  Carr further stated: "An erroneous payment was

made to the U.S. Government in the amount of $13,536.09 and should be returned."  (Chang

Dep. at 230; Dkt. 128-14 at 84-85).

Apart from the August 5, 2013 letter from Carr, Chang was unable to recall if she, as EPAM plan administrator, provided a final benefits determination to Lee. (Chang Dep. at 223-29). On August 29, 2013, Lee filed the instant action. (Dkt. 1).

### Discussion

Lee asserts four claims: wrongful denial of benefits (Count I), breach of fiduciary duty (Count II), reformation (Count III), and equitable estoppel (Count IV). Defendants move for summary judgment on each claim. Lee moves for summary judgment on Counts I, II, and III and each of Defendants' affirmative defenses. As detailed below, the Court finds that Lee prevails on his claim for wrongful denial of benefits (Count I), warranting remand to the plan administrator. The remaining claims are held in abeyance.

### A.       Exhaustion of administrative remedies

Before suing in federal court, an ERISA plaintiff must exhaust his available administrative remedies. *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1328-29 (11th Cir. 2006). Unpublished Eleventh Circuit authority holds that exhaustion is a "jurisdictional defense," rather than an affirmative defense, and may be raised at any time. *Herman v. Hartford Life & Acc. Ins. Co.*, 508 F. App'x 923, 926 (11th Cir. 2013).[2]

In response in opposition to Lee's motion for summary judgment, Defendants argue that Lee never filed a claim for benefits because he failed to complete and return the Election

---

[2] To the extent exhaustion is an affirmative defense, as other Circuits hold, a district court may consider an affirmative defense raised for the first time in a motion for summary judgment if the plaintiff fails to show prejudice. *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1222 (11th Cir. 2012). Here, Lee raises no objection to Defendants' failure to plead exhaustion as an affirmative defense and identifies no prejudice.

Forms that BSP provided on July 25, 2012—a point that Lee does not dispute.  (Dkt. 141 at

9-10; Lee Dep. at 143-44).  Defendants also argue that Lee failed to exhaust his appeal rights

under the Pension Plan, which Lee also does not dispute.  By separate motion, Defendants

move to strike all exhibits submitted in support of Lee's motion for summary judgment on

the basis that the exhibits are not part of the administrative record.  Specifically, Defendants

argue that no administrative record exists because Lee never filed a claim, and even assuming

that he did, Lee never appealed any denial.   (Dkt. 137).

The Court is not persuaded by Defendants' argument that Lee failed to file a claim for

benefits.  Section 3.9.1 of the Pension Plan specifies the following claim procedure:

> 3.9.1 <u>Claim Procedure</u>. Any Participant or Beneficiary who is entitled to
> payment of a benefit for which provision is made in this Plan, shall file a
> written claim with the Plan Administrator on such forms as furnished by the
> Plan Administrator, and shall furnish such evidence of entitlement to benefits
> as the Plan Administrator may reasonably require. The Plan Administrator
> shall notify the Participant or Beneficiary in writing as to the amount of benefit
> to which he is entitled, the duration of such benefit, the time the benefit is to
> commence, and other pertinent information concerned his benefit.
>
> If a claim for benefit is denied by the Plan Administrator, in whole or in part,
> the Plan Administrator shall provide adequate notice in writing to the
> Participant or Beneficiary whose claim for benefit has been denied within
> ninety (90) days after receipt of the claim under special circumstances require
> an extension of time for processing the claim.

(Dkt. 127-4 at 9).  The record indicates that Lee repeatedly requested benefits, both directly

to Panebianco and through his attorney.   Between at least April 11, 2012, and July 2, 2012,

Chang failed to authorize preparation of the Election Forms, despite being reminded at least

five times by Panebianco to do so.  Accordingly, the Court finds that Lee filed a claim, at the

latest, by July 20, 2012, when his attorney informed BSP that nearly 90 days had elapsed since Lee had formally requested monthly pension distributions and unequivocally demanded monthly pension benefits. (Dkt. 127-15 at 1).

Indeed, the Election Forms appear to decide Lee's initial claim for benefits. For instance, the cover letter stated: "You are entitled to a distribution under the [Pension Plan]." (Dkt. 127-16 at 1). Additionally, consistent with the claim procedure set forth in Section 3.9.1, the Election Forms notified Lee of the amount of his benefits, the date the payments were to begin, and the method for calculating the benefits. (*See id*. at 4-5). Thus, as Lee asserts, the Election Forms did not deny his claim. Rather, Lee's claim was ultimately denied by Carr's August 5, 2013 letter, which set forth Chang's "conclusions," recalculated Lee's benefits, and demanded repayment of previously-paid benefits.

Lee does not dispute that he failed to exhaust his administrative appeal rights. Instead, after his claim was denied on August 5, 2013, Lee filed the instant action on August 29, 2013. Nonetheless, Lee argues that exhaustion should be excused as futile based on Defendants' history of animus, delay, and refusal to follow claims procedures.

The Eleventh Circuit recognizes a futility exception to the exhaustion requirement if there is a "clear and positive showing of futility." *Bickley*, 461 F.3d at 1330 (internal quotation marks omitted). The mere fact that an appellate reviewer is affiliated with the initial decisionmaker is not sufficient to demonstrate that an appeal would be futile. *Springer v. Wal-Mart Assocs. Grp. Health Plan*, 908 F.2d 897, 901 (11th Cir. 1990). Likewise, the fact that an administrative scheme is in technical non-compliance with ERISA does not, by

itself, demonstrate futility, if there is evidence that the claimant otherwise had meaningful access to an administrative remedy. *Perrino v. S. Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1316-17 (11th Cir. 2000). If the claimant does not even attempt to use the administrative remedies, he waives the futility argument, "if nothing indicates that a plan administrator would have afforded a claimant less than an adequate legal remedy." *Fla. Health Sciences Ctr., Inc. v. Total Plastics, Inc.*, 496 F. App'x 6, 12 (11th Cir. 2012); *Bickley*, 461 F.3d at 1330 (holding that allegations of futility were speculative because the claimant did not attempt to appeal).

In this case, Lee makes a clear and positive showing of futility based on Chang's consistently obstructive conduct. This same conduct underlies the Court's holding that the ultimate benefits decision was arbitrary and capricious, and it is discussed in more detail below. In brief, Chang repeatedly failed to follow claim procedures, Chang's "independent" counsel was not independent, and Chang failed to notify Lee that the direct owner issue was even under consideration—despite Lee's specific request for information. When Chang issued her unilateral determination, her attorney simultaneously demanded immediate repayment of previously-paid benefits from both Lee and the government—undercutting any suggestion that Lee's claim would be meaningfully revisited on appeal.

Accordingly, this is not merely a case in which there is a prospect that Lee's appeal would have been heard by a financially-interested party, where there is technical non-compliance, or where there are bare or speculative allegations of futility. Rather, following an acrimonious business split, Chang consistently attempted to avoid making distributions under the Pension Plan. Under these circumstances, no reasonable administrative scheme

was available to Lee, and requiring Lee to exhaust his remedies would have been "an empty exercise in legal formalism." *Perrino*, 209 F.3d at 1318.

Based on the foregoing, the Court, in its discretion, excuses the exhaustion requirement. As a result, the Court does not reach Lee's alternative argument that his administrative remedies are deemed exhausted, under 29 C.F.R. § 2560.503-1(l), which provides that the failure to establish or follow ERISA-compliant claims procedures allows immediate access to judicial review.

The Court also denies Defendants' motion to strike the exhibits to Lee's motion for summary judgment. (Dkt. 137). The fact that Lee relies on evidence that is not contained in the administrative record is unsurprising, given that Defendants deny the existence of an administrative record. After Defendants filed the motion to strike, the Court directed Defendants to file the administrative record on or before October 5, 2015. (Dkt. 152). On October 5, 2015, Defendants responded that no administrative record was established and there is no evidence to review in this case because Lee "failed to initiate a claim or implement and exhaust administrative remedies under the Plan." (Dkt. 154 at 4).

As discussed, Lee did file a claim, and any difficulty that Lee encountered in filing a claim on the proper forms was the result of Chang's ongoing refusal to authorize the preparation of the correct forms. Defendants' failure to establish an administrative record supports Lee's argument that any appeal of the initial decision would have been futile, and that the decision itself was arbitrary and capricious, as discussed below.

B.      *Wrongful denial of benefits (Count I)*

1.      *Standard of review*

Pursuant to 29 U.S.C. § 1132(a)(1)(B), an ERISA participant may bring a civil action in order to recover benefits, enforce rights to benefits, or clarify rights to future benefits due under the terms of a benefit plan.  A claim alleging wrongful denial of benefits is reviewed under a *de novo* standard, unless the administrator has discretion to determine eligibility for benefits or to construe the terms of the plan.  *Crume v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 1258, 1271 (M.D. Fla. 2006) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  If the administrator has discretion, the decision is subject to arbitrary-and-capricious review and will not be disturbed if it is reasonable, based on the information known to the administrator.  *Id.* (quoting *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1451 (11th Cir. 1997)).  When an administrator operates under a structural conflict of interest, the court considers that factor in assessing whether the decision was arbitrary and capricious.  *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011).

Based on these principles, the Eleventh Circuit has developed the following six-step analysis for benefits-denial claims:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

The claimant bears the burden to demonstrate that the administrator was *de novo* wrong and that the decision was arbitrary and capricious, both of which are questions of law. *Id.*

In connection with an ERISA benefits-denial claim, the parties typically seek relief through a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. However, benefit-denial claims present unique considerations because the district court operates more as an appellate tribunal, evaluating the reasonableness of the administrative decision. *Crume, Co.*, 417 F. Supp. 2d at 1272. As a result, the usual Rule 56 standards do not apply, such as whether a genuine dispute of material exists. *Id.* Instead, a district court asks "whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002); *Blankenship*, 644 F.3d at 1354 n.4 (citing *Leahy* with approval).

## 2.     *The denial was de novo wrong*

The first step in this Court's review is to determine whether the plan administrator was *de novo* wrong.  In making a *de novo* determination, the Court may consider evidence beyond the administrative record.  *See Kirwan v. Marriott Corp.*, 10 F.3d 784, 790 n. 31 (11th Cir. 1994); *Moon v. Am. Home Assurance Co.*, 888 F.2d 86, 89 (11th Cir. 1989).

Here, the sole issue is whether Lee qualifies as a "Male direct owner."  The plan does not define "Male direct owners," but it provides that an employee belongs to one of the three classifications "if he fits the description of the classification."[3]  (Dkt. 127-3 at 27).

The terms in an ERISA policy are construed according to their plain and ordinary meaning.  *Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1234-35 (11th Cir. 2006).  If policy language is susceptible to two reasonable interpretations, one providing coverage and the other limiting coverage, the policy is considered ambiguous.  *Id.*  For purposes of *de novo* review, ambiguous language is construed against the drafter, and the claimant's interpretation is considered correct.  *White v. Coca-Cola Co.*, 542 F.3d 848, 855-57 (11th Cir. 2008).

In this case, the phrase "Male direct owners" is arguably ambiguous.  The parties offer at least two competing and reasonable interpretations of the phrase: Defendants argue that direct ownership requires actual stock ownership, while Lee maintains that it covers

---

[3] The Pension Plan defines "Owner-Employee," which appears to be relevant only to sole proprietors and partnerships, rather than to corporations such as EPAM. (Dkt. 127-3 at 18).  Neither side asserts that the definition is relevant.

ownership of a stock option.[4]  Legal authority exists in support of both interpretations, as Myers' opinion letter acknowledged. (Dkt. 127-34 at 4-10).  For instance, a number of Internal Revenue Code sections equate ownership of a stock option with ownership of the underlying stock.  *E.g.*, 26 U.S.C. § 1563(e)(1) ("If any person has an option to acquire stock, such stock shall be considered as owned by such person"); 26 U.S.C. § 318(a)(4) (same); *see also Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.*, 983 F.2d 495, 502 (3d Cir. 1992) (applying 26 U.S.C. § 1563(e) attribution rules to ERISA case).

To the extent that "Male direct owners" is ambiguous, it must be construed in favor of Lee, for the purposes of *de novo* review.  *White*, 542 F.3d at 855-57. Under Lee's interpretation, he fits the description of "Male direct owners" because he held an option to purchase 50% of EPAM's stock.  Accordingly, Defendants would be *de novo* wrong if Lee's interpretation were controlling.

Defendants would also be wrong under their own interpretation of the phrase because Lee exercised his stock option.  Specifically, on April 10, 2012, the day he was terminated, Lee tendered a $100.00 check to Chang.  The Option Agreement expressly provided that "[o]n tender of the check, Lee shall be considered a 50% shareholder."  (Dkt. 128-14 at 3). Therefore, as of April 10, 2012, Lee was "considered a 50% shareholder" in EPAM.

In their motion for summary judgment and response to Lee's motion, Defendants fail to address Lee's ownership as of April 10, 2012.  In particular, Defendants do not dispute

---

[4] Among Lee's other arguments, he contends that "Male direct owners" is a proxy description for "Jack Lee."  The Court declines to address the merits of that argument, as Lee prevails even under Defendants' interpretation of "Male direct owners."

that Lee tendered a $100.00 check to Chang, nor do they dispute that the check served to make Lee a 50% shareholder in EPAM. (Dkt. 126 at 7-8, 11; Dkt. 141 at 15-21).

Instead, Defendants attempt to dispute Lee's ownership by pointing to Lee's deposition testimony, in which he repeatedly denied any stock ownership in EPAM. However, Lee simultaneously testified that he did exercise his stock option on the day he was terminated. (Lee Dep. at 134). That testimony is consistent with Lee's affidavit, in which he avers that he exercised the stock option and received confirmation from Chang's attorney that it had been properly exercised. (Dkt. 142-1 at ¶¶ 26, 27; Dkt. 128-14 at 7-8).

Defendants also assert that Lee repeatedly failed to disclose any ownership interest in EPAM to the federal government—in an apparent effort to obtain and retain the lucrative NCUA contract. Yet Defendants fail to acknowledge the record evidence suggesting that Chang and EPAM were complicit: Chang knew of Lee's felony convictions, she paid Lee through an unrelated company during the pendency of the NCUA contract, and her company reaped the financial rewards of that contract. In any event, Lee's representations to the government are not relevant to whether Lee exercised his stock option on April 10, 2012, and thereby became a "direct owner" of EPAM.

The Court notes that, pursuant to the January 14, 2013 Settlement Agreement, Lee ultimately waived any right, title, or interest in any of the Chang entities' stocks or assets. Defendants do not assert that this waiver negated Lee's "direct owner" status, for the purpose of calculating Lee's retirement benefits in 2012.[5] The Court declines to raise that issue in the

---

[5] The parties do not meaningfully address whether Lee was entitled to a "Normal Retirement
(continued...)

first instance, but observes that the Settlement Agreement also required Chang to "perform any and all lawful acts necessary to begin *and continue* payments" to Lee under the Pension Plan. (Dkt. 127-18 at 3 (emphasis added)).  At the time Lee and Chang settled their dispute, Lee's benefits had been calculated pursuant to the Class B rate and he had already received his RMD at the Class B rate.

Based on the foregoing, the Court finds that Lee "fit the description" of "Male direct owners" as of April 10, 2012.  Defendants were therefore *de novo* wrong in determining that Lee did not fit the description of "Male direct owners" under Class B and in reclassifying him to Class C.

### 3.    *Arbitrary and capricious review*

Because the administrator was *de novo* wrong, the Court next determines whether the administrator was vested with discretion in interpreting the provisions of the Pension Plan. The parties agree that Section 3.3.1 expressly affords the plan administrator "sole discretion." (Dkt. 127-3 at 70).  Accordingly, the pertinent inquiry is whether Defendants' decision was supported by any reasonable ground.

As a general rule, review under an arbitrary-and-capricious standard is confined to the the facts and material available to the administrator at the time of the decision.  *Jett v. Blue*

---

[5](...continued)
Benefit" under Section 2.3.2 of the Pension Plan (upon reaching a normal retirement age) or a "Vested Accrued Benefit" under Section 2.3.7 (when a termination occurs before a normal retirement age).  Regardless, both types of benefit were payable commencing on the "Normal Retirement Date," which for Lee was July 31, 2012—prior to Lee's waiver of his interest in EPAM's stock.  (Dkt. 127-3 at 26, 28; Dkt. 127-16 at 4).

*Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1140 (11th Cir. 1989); *Levinson v. Reliance*

*Standard Life Ins. Co.*, 245 F.3d 1321, 1330 (11th Cir. 2001).  Although there is no

administrative record in this case, Lee's arguments are based on facts within Chang's

knowledge.  Moreover, courts may consider evidence outside of the administrative record

that is relevant to bias or procedural misconduct.  *Bloom v. Hartford Life & Acc. Ins. Co.*,

917 F. Supp. 2d 1269, 1277-78 (S.D. Fla. 2013); *see also Blankenship*, 644 F.3d at 1357

(explaining that there was no evidence of improper motivation or procedural

unreasonableness).

Among the procedural irregularities in this case is, most notably, Defendants'

admitted failure to compile an administrative record.  Although Defendants maintain that Lee

never filed a  claim, that contention is not credible, as detailed above.  In addition, the record

reveals other procedural irregularities.  Over the course of almost three months, Chang failed

to authorize BSP to prepare Lee's Election Forms, despite at least five specific reminders

from Panebianco.  When Chang discovered that the Election Forms included an incorrect

termination date, which affected Lee's vested benefits calculation, she did not direct BSP to

provide corrected forms to Lee.  When Lee inquired about the years of vesting that he was

owed, he was told that there were a "plethora of issues" that required Chang to retain

"independent" counsel for the Pension Plan.  Chang then retained Myers as counsel for The

Chang Group, Inc., not as counsel for the Pension Plan.  After hiring Myers, Chang and Carr

failed to alert Lee to the fact that Myers was closely examining the "direct owner"

issue—despite Lee's specific request for a list of issues under consideration.  Finally, Chang

admits that EPAM, as plan administrator, never provided Lee with a final determination on his claim.

These procedural irregularities render Defendants' benefits decision arbitrary and capricious. A fiduciary is required to disclose complete and accurate information in response to a participant's request. *See Hamilton v. Allen-Bradley Co.*, 244 F.3d 819, 827 (11th Cir. 2001) (holding that a failure to disclose complete and accurate information in response to participant's request is a breach of fiduciary duty); *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1199 (11th Cir. 2010) (explaining that fiduciary responsibilities illustrate the proper standard for a benefits investigation, even absent a viable breach-of-fiduciary claim). Although a fiduciary is not required to retain independent counsel in order to a make benefits decision, Chang's attorney repeatedly represented that Myers was independent, when she was not. *Cf. Adams v. Thiokol Corp.*, 231 F.3d 837, 845 (11th Cir. 2000) (holding that soliciting input from independent firms showed the evenhandedness and good faith). Most significant, there is no indication that Chang, who controlled EPAM as plan administrator, ever independently evaluated whether Lee was a direct owner based on the evidence available to her. Instead, Chang's decision relied entirely on Myers' opinion. *See Levinson*, 245 F.3d at 1326-27 (holding that decision was wrong and unreasonable where the administrator relied on nurse's review and opinion of claims examiner that the plaintiff was not disabled, rather than upon independent medical evidence).

Even if Chang were entitled to place unexamined reliance on Myers' opinion, that reliance was unreasonable because Myers was not acting as independent counsel for the

Pension Plan.  Indeed, the record indicates that Carr solicited the opinion in order to provide Chang "all indicia of acting in good faith" and to insulate Chang from liability.  (Dkt. 127-28 at 1).  Likewise, Myers understood that one of the purposes of the opinion letter was to prepare for litigation, and she submitted the opinion letter to Chang and Carr for review and comments.  (Myers Dep. at 36-37, 44-45; Dkt. 127-27; Dkt. 127-28).

Chang's reliance on Myers' opinion was also unreasonable because the opinion letter was based on erroneous and incomplete facts.  Myers stated that Lee was terminated on April 9, 2012, when he was actually terminated on April 10, 2012—the day he exercised the stock option.  Defendants cite no evidence demonstrating that Myers was aware that Lee tendered a $100.00 check to Chang, or that Myers had the opportunity to consider what effect the tender of the $100.00 check had under the specific language in the Option Agreement. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 118 (2008) (affirming judgment that decision was arbitrary and capricious where, among other things, the insurer had not provided independent consultants with all relevant evidence).  Instead, on the day Myers was engaged to represent The Chang Group, Inc., she was told that Lee was not a direct owner.  (Myers Dep. at 28).

For the foregoing reasons, the Court finds that Defendants acted arbitrarily and capriciously in determining that Lee did not fit the description of "Male direct owners" under Class B and in reclassifying him to Class C.  In reaching this decision, the Court has considered the structural conflict of interest present in this case, given that EPAM "both makes eligibility decisions and pays awarded benefits out of its own funds."  *Blankenship*,

644 F.3d at 1355. Although that factor, standing alone, is not enough to strip an administrator of deference, Lee maintains that there is additional evidence of conflict in this case. For instance, Lee suggests that Chang could amend the Pension Plan to increase her benefits, as she is the only remaining participant in the Pension Plan.

The Court declines to resolve whether this possibility demonstrates a conflict that is of "sufficient inherent or case-specific importance." *Blankenship*, 644 F.3d at 1357 (internal quotation marks omitted). Even absent a more significant conflict, Defendants' decision was arbitrary and capricious.

Having determined that the decision was arbitrary and capricious, the Court finds that the proper remedy in this case is to remand to the plan administrator to recalculate Lee's benefits, taking into account his status as a "Male direct owner" and a Class B employee as of April 10, 2012. *See Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997) (affirming remand where plan administrator accepted recommendations without engaging in an independent analysis); *Barlow v. Sun Life & Health Ins. Co.*, 488 F. App'x 458, 459 (11th Cir. 2012) ("Where an administrator applies or uses an incorrect definition of an ERISA plan term the proper course is generally to remand the matter to the administrator"); *accord Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 398 (7th Cir. 2009) (holding that remand was proper where an agency failed to make adequate findings or provide an adequate explanation).

C.      *Remaining claims (Counts II, III, and IV)*

Lee also brings claims for breach of fiduciary duty under 29 U.S.C. §§ 1132(a)(2), 1109(a) (Count II) and claims for reformation and equitable estoppel under 29 U.S.C. § 1132(a)(3) (Counts III and IV).

A plaintiff who has an adequate legal remedy under section 1132(a)(1)(B) is precluded from pursuing separate claims for equitable relief under section 1332(a)(3). *Katz v. Comprehensive Plan Of Grp. Ins.*, 197 F.3d 1084, 1089 (11th Cir. 1999). Here, Lee currently has an adequate remedy under section 1132(a)(1)(B), precluding his claims for reformation and equitable estoppel in Counts III and IV.

With respect to Count II, it is well-established that a plan participant, such as Lee, may bring an action "on behalf of a plan" to recover for violations of the statutory fiduciary duties relating to "the proper management, administration, and investment of fund assets." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 253 (2008) (internal quotation marks omitted). Claims brought pursuant to sections 1132(a)(2) and 1109(a) are aimed at protecting the financial integrity of the plan and must seek relief for the plan as a whole. *Id.* at 254; *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1338-39 (11th Cir. 2006).

In the Amended Complaint, Lee alleges that EPAM and Chang "breached their fiduciary duties to Lee," by failing to investigate and promptly process his claim for benefits. (Dkt. 40 at ¶ 73). Thus, Lee's breach of fiduciary duty claim, as pleaded in the Amended Complaint, is merely duplicative of his benefits claim and fails to address the financial

integrity of the plan as a whole.  As such, it is not cognizable under sections 1132(a)(2) and

1109(a).  *Smith v. Med. Benefit Adm'rs Grp., Inc.*, 639 F.3d 277, 282 (7th Cir. 2011); *Jenkins*

*v. Grant Thornton LLP*, No. 13-60957, 2014 WL 860547, at *4-5 (S.D. Fla. Mar. 5, 2014);

*Wallace v. Blue Cross & Blue Shield of Ala.*, No. 14-119, 2014 WL 5335823, at *5 (S.D.

Ala. Oct. 20, 2014).

        In connection with the instant motions, Lee briefly argues that, as a result of his

reclassification, the Pension Plan became overfunded.  Lee alleges that Chang transferred

$166,254.09 from the Pension Plan to the 401(K) Plan, which allowed her companies to

avoid funding the underfunded 401(k) Plan.   Lee also maintains that, to the extent the

Pension Plan is still overfunded, Chang is currently the only participant in the Plan and could

amend the Plan to increase her benefits.  (Dkt. 127 at 34; Dkt. 140 at 15-16; *see* Chang Dep.

at 233-34, 247-49).   In the Pretrial Statement, Lee states that he is seeking transfer of the

$166,254.09 amount back to the Pension Plan.  (Dkt. 158 at 5).

        Lee pleads no claim for mismanagement of plan assets in the Amended Complaint,

nor does he plead the foregoing facts.  (Dkt. 40).  "A plaintiff may not amend her complaint

through argument in a brief opposing summary judgment."  *Gilmour v. Gates, McDonald &*

*Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).  Rather, "[a]t the summary judgment stage, the

proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance

with Fed.R.Civ.P. 15(a)."  *Id*.  Lee has not sought to amend the complaint.  In any event,

Lee's allegations are at best conclusory and suggest no entitlement to relief, at this point.[6]

Based on the foregoing, Counts II, III, and IV of the Amended Complaint are held in abeyance, pending the plan administrator's recalculation on remand.

## D.    *Affirmative defenses*

Lee moves for summary judgment on each of Defendants' six affirmative defenses. Defendants fail to respond to this portion of Lee's motion.  Although it is unopposed, the Court is required to consider the merits of the motion and ensure that it is supported by the evidence.  *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101-02 (11th Cir. 2004).

The first affirmative defense requests attorney's fees and costs, which is not a true affirmative defense.  Lee's motion is granted as to the first affirmative defense.

The second affirmative defense alleges that all decisions were made in good faith reliance on advice from the third-party administrator and independent legal counsel.  This "defense" essentially relates to whether the decision to deny benefits was arbitrary and capricious, which is an element of Lee's benefits-denial claim.  "A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense."  *In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988).   Lee's motion is therefore granted as to the second affirmative defense.

---

[6] Apart from citing a statement by Myers that the transfer may be a prohibited transaction or a breach of fiduciary duty, Lee does not attempt to analyze whether the transfer was actually a prohibited transaction or a breach of fiduciary duty under 29 U.S.C. §§ 1104 and 1106.  Lee also cites no record evidence demonstrating that the Pension Plan is, in fact, overfunded, or that Chang's transfer was anything other than an attempt to correct an error made by Lee when he was acting as plan administrator.  (*See* Chang Dep. at 233; Dkt. 127-32).

The third affirmative defense asserts: "to the extent that the Plaintiff seeks to employ the doctrine of equity in this matter it is submitted that he is with unclean hands in this matter[.]" (Dkt. 43 at 8).  As Lee acknowledges, courts have applied the doctrine of unclean hands to ERISA actions seeking equitable relief.  *E.g.*, *Anweiler v. Am. Power Serv. Corp.*, 3 F.3d 986, 993 (7th Cir. 1993). The fourth affirmative defense asserts that Plaintiff's equitable claim of reformation may have adverse legal consequences for the Plan.  Because Lee's equitable claims are held in abeyance, the third and fourth affirmative defenses are also held in abeyance.

The fifth affirmative defense alleges that it is impossible to distribute money to Lee under the plan as drafted.  To the extent that impossibility is a valid defense to a benefits-denial claim under ERISA, Defendants fail to identify specific record evidence indicating that performance was impossible.  *In re Hostess Brand, Inc.*, 499 B.R. 406, 414-15 (S.D.N.Y. 2013).  Defendants also cite no facts showing that EPAM "took virtually every action within its power to perform its duties under the contract."  *Rispler v. Sol Spitz Co.*, 418 F. Supp. 2d 82, 91 (E.D.N.Y. 2005) (internal quotation marks omitted).  To the contrary, the record suggests that Chang took a number of actions to avoid paying Lee his benefits under the Pension Plan.  Lee's motion is granted as to the fifth affirmative defense.

Finally, the sixth affirmative defense asserts that "the inability to distribute monies because of eligibility of Mr. Lee are wholly or exclusively as a result of the mistakes, intentional misleading or outright fraudulent acts by Mr. Lee in the establishment and or operation of the pension plan."  (Dkt. 43 at 9).  This defense appears to incorporate two

defenses to contract formation recognized under contract law: fraudulent inducement and mistake. As to the former, at least one court has applied fraudulent inducement to render an ERISA plan unenforceable. *Nash v. Trs. of Boston Univ.*, 946 F.2d 960, 967 (1st Cir. 1991). Similarly, a unilateral mistake or a mutual mistake renders a contract voidable. *E. Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 1546, 1551 n.4 (11th Cir. 1988); *Anderson Bros. Corp. v. O'Meara*, 306 F.2d 672, 676 (5th Cir. 1962).

As Lee notes, however, it does not appear that Defendants are asserting, in this action, that the Pension Plan is voidable or unenforceable. The defense instead appears to relate to whether the decision to deny benefits was arbitrary and capricious, and it is thus not a true affirmative defense. *In re Rawson Food Serv., Inc.*, 846 F.2d at 1349. Defendants also cite no evidence that they were, in fact, unable to distribute payments to Lee. Lee's motion is granted as to the sixth affirmative defense.

### E.    *Counterclaim*

In their initial Answer, Defendants asserted a counterclaim demanding return of $54,144.35. (Dkt. 12). Defendants did not include the counterclaim in their Amended Answer. (Dkt. 43). Neither side addresses the counterclaim in the motions for summary judgment. To the extent that the counterclaim remains viable, it is held in abeyance pending the plan administrator's recalculation on remand, which shall take into account any amounts previously distributed under the Pension Plan.

### F.     Motions to strike

Lee moves to strike portions of two affidavits executed by Chang, which Defendants filed in connection with the instant motions.  (Dkts. 138, 146).  The Court has not relied on the challenged paragraphs, and the motions to strike are therefore denied as moot.

Lee also moves to strike the deposition of L. Lee Smith (Dkt. 151) because it was conducted after the applicable discovery deadline and filed after the dispositive motion deadline.  (Dkt. 153).  In the motion to strike, Lee concedes that the purpose of the deposition was to authenticate the June 29, 2009 letter from Smith to the U.S. Attorney's Office.  Lee also admits that he was willing to stipulate to the letter's authenticity, and the Court has therefore considered the letter in evaluating the instant motions.  Because Defendants do not otherwise rely on Smith's deposition, the motion to strike is denied as moot.

### Conclusion

Based on the foregoing, it is **ORDERED AND ADJUDGED** that:

(1)   Defendants' Dispositive Motion for Summary Final Judgment (Dkt. 126) is **DENIED**;

(2)  Plaintiff's Motion for Partial Summary Judgment (Dkt. 127) is **GRANTED IN PART** as to Count I of the Amended Complaint (Dkt. 40) and as to Defendants' first, second, fifth, and sixth affirmative defenses (Dkt. 43).  The motion is **DENIED IN PART** as to

Counts II, III, and IV of the Amended Complaint and as to Defendants' third and fourth affirmative defenses.

(3)   The motions to strike (Dkts. 137, 138, 146, 153) are **DENIED**;

(4)   Plaintiff's claim for benefits under the EPAM Defined Benefit Pension Plan is **REMANDED** to the plan administrator for reconsideration consistent with this Order.   In particular, the plan administrator shall recalculate Plaintiff's benefits taking into account his status as a "Male direct owner" and Class B employee as of April 10, 2012.   In recalculating Plaintiff's benefits, the plan administrator shall obtain all necessary assistance from the third-party administrator and actuary.   The plan administrator shall also maintain a proper administrative record;

(5)   Counts II, III, and IV of the Amended Complaint (Dkt. 40), Defendants' Counterclaim (Dkt. 12), and Defendants' third and fourth affirmative defenses (Dkt. 43) are each **HELD IN ABEYANCE**, pending the plan administrator's recalculation on remand;

(6)   The case is **STAYED** pending reconsideration by the plan administrator. The parties shall file a joint status report on or before January 31, 2016, and every ninety (90) days thereafter. If the parties reach a settlement, they shall file a notice of settlement immediately.   Failure to file timely status reports will result in the dismissal of this action without further notice.

(7)  The Clerk is directed to **ADMINISTRATIVELY CLOSE** this case.

**DONE** and **ORDERED** in Tampa, Florida on November 10, 2015.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

<u>Copies furnished to</u>:

Counsel/Parties of Record

U.S. Attorney's Office
ATTN: Assistant United States Attorney
Gail Noll
2110 First Street, Suite 3-137
Fort Myers, Florida 32902